Daniel L. Germain (Cal. Bar No. 143334)
ROSMAN & GERMAIN LLP
16311 Ventura Blvd., Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

Counsel for Plaintiffs and the Putative Class

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OBALEET SARGONY, RONALD HUDSON, ADAM BLACKBURN, ROBERT L. HACKETT, TABITHA HOGLUND and STEPHANIE C. CHADWICK, individually and on behalf of all others similarly situated, | ) CASE NO: <br> ) <br> ) **CLASS ACTION COMPLAINT** <br> ) <br> ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) |
| SUTTER HEALTH, THE BOARD OF DIRECTORS OF SUTTER HEALTH, THE RETIREMENT BENEFITS INVESTMENT COMMITTEE, and JOHN DOES 1-30. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

Plaintiffs Obaleet Sargony, Ronald Hudson, Adam Blackburn, Robert L. Hackett, Tabitha Hoglund and Stephanie C. Chadwick ("Plaintiffs"), by and through their attorneys, on behalf of the Sutter Health 403(b) Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.   INTRODUCTION

1.   This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Sutter Health ("Sutter" or the "Company"), the Board of Directors of Sutter Health ("Board"), and its members during the Class Period and the Retirement Benefits Investment Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.   Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.   As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

---

[1] The Plan is a legal entity that can sue and be sued.   ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).   However, in a breach of fiduciary duty action such as this, the Plan is not a party.   Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. Sutter Health established the Sutter Health 403(b) Match Savings Plan effective January 1, 2008. The Sutter Health 403(b) Savings Plan was merged into the Sutter Health 403(b) Match Savings Plan effective December 17, 2018, and the Plan is now known as the Sutter Health 403(b) Savings Plan. Both the Sutter Health 403(b) Match Savings Plan and the Sutter Health 403(b) Savings Plan will be referred to collectively as (the "Plan").

3.      In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015) ("*Tibble I*"). Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      The Plan has at all times, during the Class Period maintained over 2.1 billion dollars in assets (including having 3.6 billion dollars in assets in 2018), qualifying it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. These assets are entrusted to the care of the Plan's fiduciaries. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.      Plaintiffs allege that during the putative Class Period (July 21, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain

funds in the Plan despite the availability of identical or materially similar investment options with lower costs and/or better performance histories.

7.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

8.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

10.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

11.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.   PARTIES

**Plaintiffs**

12.    Plaintiff Obaleet Sargony ("Sargony") resides in Turlock, California.  During his employment, Plaintiff Sargony participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

13.    Plaintiff Ronald Hudson ("Hudson") resides in Valeo, California.  During his employment, Plaintiff Hudson participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

14.    Plaintiff  Adam  Blackburn  ("Blackburn")  resides  in  Northampton, Massachusetts.   During his employment, Plaintiff Blackburn participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

15.    Plaintiff Robert L. Hackett ("Hackett") resides in Antioch, California.  During his employment, Plaintiff Hackett participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

16.    Plaintiff Tabitha Hoglund ("Hoglund") resides in Saginaw, Texas.  During her employment, Plaintiff Hoglund participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

17.    Plaintiff Stephanie C. Chadwick ("Chadwick") resides in Reno, Nevada. During her employment, Plaintiff Chadwick participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

18.    Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

19.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered

within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.[2]  Moreover, having never managed a jumbo plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

20.     Sutter Health is the Plan sponsor.  *See* 2018 Form 5500 at 1.  Its corporate headquarters is located at 2200 River Plaza Drive, Sacramento, California 95833.  Sutter Health is a not-for-profit integrated health delivery system headquartered in Sacramento, California. It operates 24 acute care hospitals and over 200 clinics in Northern California. Based on 2017 data, Sutter Health states that it "directly and indirectly supported $10.7 billion in wages and 119,000 direct and indirect jobs statewide.[3]" In 2018, Sutter Health reported over 13 billion dollars in total operating revenue. *Id.*

---

[2] *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

[3] https://www.sutterhealth.org/annualreport2018/financials

21.    "Sutter Health is the Administrator of the Plan." Sutter Health 403(b) Savings Plan Summary Plan Description Revised April of 2020 ("SPD") at 26.   In executing its powers, the "[t]he primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries" Sutter Health 403(b) Saving Plan as Amended and Restated Effective December 17, 2018 ("Plan Doc.") at 70.

22.    In addition, Sutter "[w]ith the consent of the Board, or its designees, the Administrator shall have the right and power to appoint one or more representatives … to assist the Administrator in the administration of the Plan." *Id* at 72. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

23.    Additionally, at all times, Sutter acted through its officers, including the Committee, to perform Plan-related fiduciary functions.

24.    Lastly, Sutter made discretionary decisions to make non-elective contributions. The SPD defines non-elective contributions as "[d]iscretionary contributions your employer may elect to make to the Plan that are separate from matching contributions." SPD at iii.

25.    For all the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**<u>Board Defendants</u>**

26.    The Board appoints designees. As discussed in the Plan Doc. "[w]ith the consent of the Board, or its designees, the Administrator shall have the right and power to appoint one or more representatives … to assist the Administrator in the administration of the Plan." Plan Doc. at 72.

27.    Sutter, acting through its Board of Directors "reserves the right to change or even terminate the Plan." SPD at 27.

28.    Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

29.     Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     The Board and its members during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

31.     "The Retirement Benefits Committee is responsible for (1) establishing and revising the Plan's investment policy … ." The December 31, 2018 Report of Independent Auditors and Financial Statements of the Sutter Health 403(b) Savings Plan ("2018 Auditor Report") at 6. The investment policy was established to "ensure the prudent selection and monitoring of Plan investments or investment options." Plan Doc. at 69.

32.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

33.     The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

34.     To the extent that there are additional officers and employees of Sutter who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Sutter officers and

employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.   THE PLAN

35.   Sutter "established the Plan effective January 1, 2008." 2018 Auditor Report at 6. Since the Plan was established it was amended several times. Most notably, "[t]he Sutter Health 403(b) Savings Plan was merged into Sutter Health 403(b) Match Savings Plan effective December 17, 2018, and the Plan is now known as the Sutter Health 403(b) Savings Plan." SPD at 1.

36.   The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA Section  3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  *See,* SPD at i.   Specifically, the SPD provides: "[t]he Sutter Health 403(b) Savings Plan is classified as a defined contribution plan." *Id*. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

37.   As detailed in the 2018 Auditor Report: "[g]enerally, all eligible employees of the Plan Sponsor and affiliated entities who have adopted the Plan became participants up their hire date." 2018 Auditor Report at 6.

### *Contributions and Vesting*

38.   There are several types of contributions that can be added to a participant's account, including, but not limited to, an employee salary deferral contribution, an employer matching contribution and employer nonelective contributions.  2018 Auditor Report at 7 through 9.  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id*.

39.     Employees may make employee salary deferral contributions "in any percentage of their pre-tax annual compensation, as defined by the Plan … ." *Id.*

40.     Sutter has many affiliates that participate in the Plan and the method of making contributions varies by affiliate. As discussed in the 2018 Auditor Report: "[e]ach participating affiliate determines its matching formula and whether or not it will make nonelective contributions." 2018 Auditor Report at 8. To give one example, if an employee is employed by Sutter Medical Foundation North that employee will be eligible for a "matching formula equal to 50% of the first 1% of compensation." This formula is fairly constant between each affiliate, but the matching formula varies from 50% to 1% through a high of 6%. *Id.*

41.     Sutter made discretionary decisions about the non-elective contributions to Plan participants. SPD at iii. The SPD defines non-elective contributions as "[d]iscretionary contributions your employer may elect to make to the Plan that are separate from matching contributions." *Id.* No non-elective contributions were made in 2018. *Id.*

42.     From their first contribution to the Plan, participants are always "100% vested in their voluntary deferral contributions, rollover contributions and employer nonelective contributions … ." *Id* at 9. Vesting in the Company's contribution portion is based on years of continuous service. "Employer matching and gainsharing contributions generally become 100% vested after three years of service … ." *Id.*

43.     Like other companies that sponsor 401(k) plans for their employees, Sutter enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

44.     Sutter also benefits in other ways from the Plan's matching program. It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company. By hiring and retaining

employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with unhappy or lower-performing workers." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

45.     Given the size of the Plan, Sutter likely enjoyed a significant tax and cost savings from offering a match.

### The Plan's Investments

46.     Several investments were available to Plan participants for investment each year during the putative Class Period, including several Fidelity target date funds. The Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance.   For 2018, the Plan offered 33 investment options, which included 29 mutual funds, 3 money market accounts and 1 variable annuity life insurance contract.

47.     The Plan's assets under management for all funds as of the end of 2018 was $3,681,905,044.  2018 Auditor Report at 4.  From 2014 to 2017 the Plan's assets under management ranged from $2.1 billion to $3.7 billion.

### Plan Expenses

48.     As detailed in the Plan Document, "[f]ees incurred as a result of recordkeeping or compliance reporting for the Plan may be assessed directly to Participant Accounts." Plan Doc. at 37.

## V.     CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the Plan,

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

at any time between July 21, 2014 through the date of judgment (the "Class Period").

50.     The members of the Class are so numerous that joinder of all members is impractical.   The 2018 Form 5500 filed with the Dept. of Labor lists 73,408 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

51.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.   Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

52.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

53.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs

are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

54.   This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

55.   In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

56.   ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

57.   ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under Section 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility

to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

58.   As described in the "Parties" section above, Defendants were fiduciaries of the Plan because:

(a)   they were so named; and/or

(b)   they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)   they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)   they had discretionary authority or discretionary responsibility in the administration of the Plan.

59.   As fiduciaries, Defendants are/were required by ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law." *Tibble* 843 F.3d at 1197 (9th Cir. Dec. 30, 2016) (*en banc*). The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.   *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.,* at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available

to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

60.   In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of himself or third persons.

61.   ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

62.   In addition, ERISA Section 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary"), further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

63.   During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investments chosen for a plan are not to favor the fund provider over the plan's participants. Yet here, to the detriment of the Plan and its participants and

beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise not justified on the basis of their economic value to the Plan or Plan participants.

64.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for: (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

65.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.     Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

66.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

67.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-

activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."). As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

68. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Although 401(k) accounts may be fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

69. In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A Look at 401(k) Plan Fees*," *supra*.

70. The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

71. Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as

investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.   Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

72.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

73.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 135 S. Ct. at 1823.  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

74.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."   Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").   Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

75.    When jumbo plans, particularly those with over a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type

of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

76.     The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

77.     During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

78.     One indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets).

79.     In 2018, for example, the majority of funds in the Plan (at least 21 out of the 29 mutual funds or more than 72%) had expense ratios well above the median expense ratios for similarly sized plans.

80.      The expense ratios for funds in the Plan in some cases were up to up to **203%** (in the case of the Northern Small Cap Value) and **181**% (in the case of Fidelity Balanced K) above the median expense ratios in the same category: [5]

| Fund in the Plan | Exp Ratio[6] | Investment Style | ICI Median |
|---|---|---|---|
| Fidelity Freedom K 2025 Fund | 0.56% | Target Date | 0.47% |
| Fidelity Freedom K 2030 Fund | 0.60% | Target Date | 0.47% |

---

[5]  *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf

[6] The listed expense ratios are taken from summary prospectuses published in 2019.

| Fund in the Plan | Exp Ratio[6] | Investment Style | ICI Median |
|---|---|---|---|
| Fidelity Freedom K 2035 Fund | 0.63% | Target Date | 0.47% |
| Fidelity Freedom K 2040 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2045 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2050 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2055 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2060 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2015 Fund | 0.49% | Target Date | 0.47% |
| Fidelity Freedom K 2020 Fund | 0.53% | Target Date | 0.47% |
| T Rowe Institutional Large Cap Core Growth | 0.56% | Domestic Equity | 0.33% |
| Dodge & Cox Stock | 0.52% | Domestic Equity | 0.33% |
| Northern Small Cap Value | 1.00% | Domestic Equity | 0.33% |
| Fidelity Small Cap Growth K6 | 0.60% | Domestic Equity | 0.33% |
| Parnassus Core Equity Inst (Equity Inc) | 0.63% | Domestic Equity | 0.33% |
| Lazard Emerging Markets Equity Inst | 1.08% | International Equity | 0.50% |
| Fidelity Balanced K | 0.45% | Non-Target Balanced | 0.16% |
| Dodge & Cox Income Fund (US Div Inc) | 0.43% | Domestic Bonds | 0.36% |
| Pimco Low Duration Inst | 0.46% | Domestic Bonds | 0.36% |
| Fidelity (Spartan) Inflation Protected Bond Index | 0.05% | Index Mutual Funds | 0.04% |
| Fidelity (Spartan) Global ex US Index | 0.06% | Index Mutual Funds | 0.04% |

81.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for target date funds for plans with over 1 billion dollars in assets was 0.56% using 2015 data compared with 0.47% in 2016.  Accordingly, the median expense ratios in 2020, or for that matter 2019, utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

82.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### Failure to Utilize Lower Fee Share Classes

83.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

84.    Jumbo defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a jumbo plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest

share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

85.    Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately."  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

86.    Here, had the Plan's fiduciaries been faithfully reviewing the Plan's funds "quarterly to ensure they [were] meeting their established standards," SPD at 12, as they should have been, they would have selected the lower-priced identical funds.

87.    As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.  The chart below uses 2019 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund | Current ER | Identical Lower Share Class Fund | Identical Lower Cost ER | Excess |
|---|---|---|---|---|
| Fidelity Freedom K 2005 Fund | 0.42% | Fidelity Freedom K6 2005 Fund | 0.37% | 12.66% |
| Fidelity Freedom K 2010 Fund | 0.46% | Fidelity Freedom K6 2010 Fund | 0.39% | 16.47% |
| Fidelity Freedom K 2015 Fund | 0.49% | Fidelity Freedom K6 2015 Fund | 0.41% | 17.78% |

| Current Fund | Current ER | Identical Lower Share Class Fund | Identical Lower Cost ER | Excess |
|---|---|---|---|---|
| Fidelity Freedom K 2020 Fund | 0.53% | Fidelity Freedom K6 2020 Fund | 0.43% | 20.83% |
| Fidelity Freedom K 2025 Fund | 0.56% | Fidelity Freedom K6 2025 Fund | 0.45% | 21.78% |
| Fidelity Freedom K 2030 Fund | 0.60% | Fidelity Freedom K6 2030 Fund | 0.47% | 24.30% |
| Fidelity Freedom K 2035 Fund | 0.63% | Fidelity Freedom K6 2035 Fund | 0.49% | 25.00% |
| Fidelity Freedom K 2040 Fund | 0.65% | Fidelity Freedom K6 2040 Fund | 0.50% | 26.09% |
| Fidelity Freedom K 2045 Fund | 0.65% | Fidelity Freedom K6 2045 Fund | 0.50% | 26.09% |
| Fidelity Freedom K 2050 Fund | 0.65% | Fidelity Freedom K6 2050 Fund | 0.50% | 26.09% |
| Fidelity Freedom K 2055 Fund | 0.65% | Fidelity Freedom K6 2055 Fund | 0.50% | 26.09% |
| Fidelity Freedom K 2060 Fund | 0.65% | Fidelity Freedom K6 2060 Fund | 0.50% | 26.09% |
| Fidelity Freedom Income K | 0.42% | Fidelity Freedom Income K6 | 0.37% | 12.66% |

88.    The above is for illustrative purposes only.   At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

89.     Fidelity's K6 shares came to the market on June 7, 2017.  Generally, "K6 Funds and Class K are available to retirement plans recordkept at Fidelity [like the Plan here]." Fidelity Pricing at 3.  "K6 Funds are intended for plan sponsors that do not want to receive any revenue sharing or recordkeeping offsets." *Id.*

90.     The nearly two year period it took for the Plan's fiduciaries to switch from the Fidelity Freedom K to an identical lower-priced share class cost the Plan tens of millions of dollars.[7]

91.     Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II,* 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).  The individual fund and combined funds assets under management easily qualified them for lower share classes.  The following is a sampling of the assets under management as of the end of 2018:

| Current Fund | Category | Assets Under Management |
|---|---|---|
| Fidelity Freedom K 2025 Fund | Target-date Fund | $396,837,266 |
| Fidelity Freedom K 2030 Fund | Target-date Fund | $362,149,023 |
| Fidelity Freedom K 2035 Fund | Target-date Fund | $351,164,056 |

---

[7] In April 2019, the Plan switched from the Fidelity Freedom K Funds to the Freedom K6 Target Date Blend Funds.

| Current Fund | Category | Assets Under Management |
|---|---|---|
| Fidelity Freedom K 2020 Fund | Target-date Fund | $344,857,035 |
| Fidelity Freedom K 2040 Fund | Target-date Fund | $316,846,428 |
| Fidelity Freedom K 2045 Fund | Target-date Fund | $264,847,632 |
| Fidelity Freedom K 2050 Fund | Target-date Fund | $185,781,125 |
| Fidelity Freedom K 2015 Fund | Target-date Fund | $120,363,035 |
| Fidelity Freedom K 2055 Fund | Target-date Fund | $62,918,995 |
| Fidelity Freedom K 2010 Fund | Target-date Fund | $33,310,436 |
| Fidelity Freedom Income K | Target-date Fund | $18,339,457 |
| Fidelity Freedom K 2060 Fund | Target-date Fund | $9,485,897 |
| Fidelity Freedom K 2005 Fund | Target-date Fund | $7,383,174 |

92.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

93.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  This is especially relevant in this action given that Fidelity was the Plan's recordkeeper.  Thus, Defendants have no reasonable excuse for not knowing about the immediate availability of the lower Fidelity share classes.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

94.     It is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble III*, 2017 WL 3523737, at * 8.   Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing."  *Id.* at * 11.  This lack of exercising basic fiduciary practice resonates loudly in this case given the unreasonable recordkeeping and administrative costs arrangements put in place by Defendants.

95.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

96.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken

advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

97.    Prior to the start of the Class Period and through October 1, 2015, the Plan participated in Fidelity's participant revenue credit program through which recordkeeping fees and other Plan administrative costs were paid through the following structure.  The Trustee made annual revenue credit payments, from the funds it received through revenue sharing, to a Revenue Credit Account.   Afterward, the administrator could direct the Trustee to use amounts held in the Revenue Credit Account to reimburse the Sponsor for fees and expenses associated with services provided to the Plan, or pay such vendors, including the Trustee or third parties, directly.  Any unused amounts is not required to be remitted back to participants.

98.    Beginning on October 1, 2015, the Revenue Credit Account was replaced with the Participant Revenue Account, which served similar purposes as the prior revenue credit program.  The money collected from revenue sharing would be credited to pay for recordkeeping every quarter.

99.    Over the years, this arrangement of placing revenue sharing funds into an account before disbursement to pay for Plan expenses deprived Plan participants of use of their money and millions of dollars in lost opportunity costs.  A more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

100.   Here, in 2015 Fidelity and the Company agreed to a per participant annual recordkeeping fee of $34 per participant, yet the Plan's fiduciaries continued to select funds for the Plan that were unduly expensive in part because of the available revenue sharing for those funds.  Knowing the exact amount of recordkeeping fees made it imprudent and unnecessary to utilize funds with revenue sharing because inevitably the

revenue sharing would produce revenue far in excess of what it actually cost to maintain recordkeeping as was the case here.   This excess amount cost Plan participants lost opportunity to invest the amounts.

101.   By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees. Further, to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants, this was a further fiduciary breach that cost Plan participants millions of dollars during the Class Period.

### *Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds*

102.   As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."   Restatement (Third) of Trusts § 100 cmt. b(1).

103.   While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington   Post,   available   at   https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

104.   Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. &

Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

105.   During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

106.   The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  The chart below uses 2019 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[8] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2015 Fund | 0.49% | Fidelity Freedom Index 2015 Inst. Premium Class[9] | 0.08% | Target Date | 143.86% |
| | | American Funds 2015 Trgt Date Retire R6 | 0.31% | | 45.00% |
| | | | | | |
| Fidelity Freedom K | 0.53% | Fidelity Freedom Index | 0.08% | Target Date | 147.54% |

[8] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).  Where only one fund is listed, index funds are identified by the word "index" following the fund name. Actively managed funds don't have this designation.

[9] The Fidelity Freedom Index Inst. Premium Class target date funds were not available until June 24, 2015. However, the Fidelity Freedom Investor Class was available as of December 2, 2009. It has an expense ratio of .14% which was much lower than the target date found in the Plan.

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[8] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| 2020 Fund | | 2020 Inst. Premium Class | | | |
| | | American Funds 2020 Trgt Date Retire R6 | 0.31% | | 52.38% |
| | | | | | |
| Fidelity Freedom K 2025 Fund | 0.56% | Fidelity Freedom Index 2025 Inst. Premium Class | 0.08% | Target Date | 150.00% |
| | | American Funds 2025 Trgt Date Retire R6 | 0.33% | | 51.68% |
| | | | | | |
| Fidelity Freedom K 2030 Fund | 0.60% | Fidelity Freedom Index 2030 Inst. Premium Class | 0.08% | Target Date | 152.94% |
| | | American Funds 2030 Trgt Date Retire R6 | 0.35% | | 52.63% |
| | | | | | |
| Fidelity Freedom K 2035 Fund | 0.63% | Fidelity Freedom Index 2035 Inst. Premium Class | 0.08% | Target Date | 154.93% |
| | | American Funds 2035 Trgt Date Retire R6 | 0.37% | | 52.00% |
| | | | | | |
| Fidelity Freedom K 2040 Fund | 0.65% | Fidelity Freedom Index 2040 Inst. Premium Class | 0.08% | Target Date | 156.16% |
| | | American Funds 2040 Trgt Date Retire R6 | 0.38% | | 52.42% |
| | | | | | |
| Fidelity Freedom K | 0.65% | Fidelity Freedom Index | 0.08% | Target Date | 156.16% |

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[8] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| 2045 Fund | | 2045 Inst. Premium Class | | | |
| | | American Funds 2045 Trgt Date Retire R6 | 0.38% | | 52.42% |
| | | | | | |
| Fidelity Freedom K 2050 Fund | 0.65% | Fidelity Freedom Index 2050 Inst. Premium Class | 0.08% | Target Date | 156.16% |
| | | American Funds 2050 Trgt Date Retire R6 | 0.39% | | 50.00% |
| | | | | | |
| Fidelity Freedom K 2055 Fund | 0.65% | Fidelity Freedom Index 2055 Inst. Premium Class | 0.08% | Target Date | 156.16% |
| | | American Funds 2055 Trgt Date Retire R6 | 0.40% | | 47.61% |
| | | | | | |
| Fidelity Freedom K 2060 Fund | 0.65% | Fidelity Freedom Index 2060 Inst. Premium Class | 0.08% | Target Date | 156.16% |
| | | American Funds 2060 Trgt Date Retire R6 | 0.41% | | 45.28% |
| | | | | | |
| Fidelity Freedom K 2005 Fund | 0.42% | Fidelity Freedom Index 2005 Inst. Premium Class | 0.08% | Target Date | 136.00% |
| | | | | | |
| Fidelity Freedom K 2010 Fund | 0.46% | Fidelity Freedom Index 2010 Inst. Premium Class | 0.08% | Target Date | 140.74% |
| | | | | | |

| Current Fund | Exp Ratio | Passive/Active Lower Cost Alternative[8] | Exp Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom Income K | 0.42% | Fidelity Freedom Index Fund Investor Class | 0.12% | Target Date | 111.11% |
| | | American Funds Moderate Growth & Inc R6 | 0.37% | | 12.60% |
| | | | | | |
| Lazard Emerging Markets Equity Inst | 1.08% | Vanguard Emerging Markets Stock Index Fund Adm Shares | 0.14% | International Equity | 154.10% |
| | | Fidelity Emerging Markets K | 0.80% | | 29.79% |
| | | | | | |
| Northern Small Cap Value | 1.00% | Vanguard Russell 2000 Value Index Fund Inst | 0.08% | Domestic Equity | 170.37% |
| | | Fidelity Small Cap Value | 0.66% | | 40.96% |
| | | | | | |
| T Rowe Institutional Large Cap Core Growth | 0.56% | Vanguard Russell 1000 Growth Index I | 0.07% | Domestic Equity | 155.57% |
| | | Fidelity OTC K6 | 0.50% | | 11.32% |
| | | | | | |
| Dodge & Cox Stock | 0.52% | Vanguard Equity Income Admiral Shares | 0.18% | Domestic Equity | 97.14% |

107.   The above alternative funds had better performances than the Plan's funds in their 3 and 5 year average returns as of 2020.   Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any

difference was immaterial.

108.   With regard to the comparison of the actively managed funds to passively managed funds, these results are not surprising given that in the long-term, actively managed funds do not outperform their passively-managed counterparts.   Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[10]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

109.   More specifically, as it relates to this Plan, the Fidelity Freedom Index  Inst. Premium Class had no material difference with its actively managed counterpart.   For example, comparing the Fidelity Freedom 2040 Class K to the Fidelity Freedom Index 2040 Inst. Premium Class reveals the following:

---

[10] Source: https://us.spindices.com/spiva/#/reports

Asset Allocation (as of 6/30/2020)

|  | Fidelity Freedom 2040 Class K | Fidelity Freedom Index 2040 Inst. Premium Class |
|---|---|---|
| Domestic Equities | 51.71% | 53.67% |
| International Equities | 41.29% | 36.61% |
| Bonds | 5.93% | 6.81% |
| Short-Term Debt & Net Other Assets | 1.07% | 2.91% |

110.   Further, as of May 31, 2020, the two funds had materially similar equity style perspective:

|  | Fidelity Freedom 2040 Class K | Fidelity Freedom Index 2040 Inst. Premium Class |
|---|---|---|
| Large Blend | 83.33% Fund Assets Covered | 86.51% Fund Assets Covered |
| Large Blend Description | Invest in companies with market values greater than $10 billion. These funds invest in a combination of growth and value-oriented stocks | Invest in companies with market values greater than $10 billion. These funds invest in a combination of growth and value-oriented stocks |

111.   Further, the Fidelity target date index funds measured better in every relevant statistical category: Cost (Expense Ratio, management fee, etc. ); absolute/after cost Returns & Absolute/after cost Returns vs the S&P 500 benchmark; investment sensitivity to market movements (Beta); how much returns varied over time/return variance (Standard Deviation); correlation of the portfolio's returns to the benchmark's returns (R Squared);

Excess return to determine reward per unit of risk (Sharpe Ratio); the consistency of the portfolio manager (Information Ratio); and how much the investment outperformed/under-performed the benchmark during periods of positive/negative returns (Upside/Downside Capture).

112. A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

113. The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period. The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

114. Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

**C.    Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

115. The structure of this Plan is rife with potential conflicts of interest because Fidelity and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants. Here, the Plan's Trustee is Fidelity Management Trust Co., and an affiliate of Fidelity, Fidelity Investments Institutional, performs the recordkeeping services for the Plan.

116. This conflict of interest is laid bare in this case where lower-cost Fidelity mutual funds – materially similar or identical to the Plan's other Fidelity funds (other than in price) – were available but not selected because the higher-cost funds returned more value to Fidelity.

117. There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in Fidelity's coffers.

118. The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Fidelity and its affiliates and ensure that the fees charged by Fidelity and its affiliates were

reasonable and in the best interests of the Plan and its participants.  Clearly, Defendants failed this aspect of their fiduciary duties.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

119.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120.   At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

121.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

122.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

123.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net

investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

124.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

125.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Sutter and the Board Defendants)

126.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

127.   Sutter and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

128.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

129.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

130.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)   failing to monitor the processes by which Plan investments were evaluated and their failure to investigate the availability of lower-cost share classes; and

(c)   failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

131.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

132.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

# **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.   An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.   Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.   An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.   An award of pre-judgment interest;

J.   An award of costs pursuant to 29 U.S.C. § 1132(g);

K.   An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.   Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Dated: July 21, 2020           **ROSMAN & GERMAIN LLP**

By: */s/ Daniel L. Germain*
Daniel L. Germain (State Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
Email: germain@lalawyer.com

**CAPOZZI ADLER, P.C.**

By: */s/ Donald R. Reavey*       .
Donald R. Reavey, Esquire
(*Motion Pro Hac to be requested*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com

(717) 233-4101
Fax (717) 233-4103

By: /s/ *Mark K. Gyandoh*          .
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
(*Motion Pro Hac to be requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class